1

2

3

4

5

6

7

8

9

10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

11  JOE ABBOTT,                          )   No. C 11-0183 LHK (PR)
                                         )
12            Plaintiff,                 )   ORDER GRANTING IN PART AND
                                         )   DENYING IN PART DEFENDANTS'
13     vs.                               )   MOTION FOR SUMMARY
                                         )   JUDGMENT; DENYING MOTION
14                                       )   FOR PRELIMINARY INJUNCTION;
    E. TOOTELL, et al.,                  )   REFERRING CASE TO
15                                       )   SETTLEMENT PROCEEDINGS
              Defendants.                )
16  _____  )   (Docket Nos. 88, 103, 105, 122)

17      Plaintiff, proceeding *pro se*, filed an amended civil rights complaint pursuant to 42

18  U.S.C. § 1983 against prison officials at San Quentin State Prison ("SQSP").  Plaintiff alleges

19  that defendants Chief Medical Officer ("CMO")[1] Dr. Tootell, Dr. Grant, Dr. Jones, Lieutenant

20  Arnold, and Sergeant Seman were deliberately indifferent to plaintiff's serious medical needs, in

21  violation of the Eighth Amendment.

22      Defendants have moved for summary judgment.  Plaintiff has filed an opposition and

23  supporting papers, and defendants have filed a reply.  Plaintiff has also filed a motion for

24  preliminary injunction.  Defendants have filed an opposition, and plaintiff has filed a reply.

25  Having carefully considered the papers submitted, the court hereby GRANTS in part and

26

27  _____

28      [1]  The parties appear to use CMO and Chief Medical Executive ("CME")
    interchangeably.  For purposes of consistency, the court will refer to Dr. Tootell as the CMO.

1  DENIES in part defendants' motion for summary judgment, and DENIES plaintiff's motion for

2  preliminary injunction for the reasons set out below.

3  <center>**BACKGROUND**</center>

4  The following facts are viewed in the light most favorable to plaintiff, and are undisputed

5  unless otherwise indicated.

6  Plaintiff is an inmate on death row at SQSP.  (Am. Compl. at ¶ 2.)  From 2006 through

7  2008, plaintiff had an ice chrono, which allowed him to receive ice to help ameliorate his chronic

8  pain in his right knee and right shoulder.  (Pl. Decl. at ¶¶ 2-4.)

9  On April 8, 2008, Dr. Matan, an outside orthopedic specialist, performed surgery on

10  plaintiff's right knee.  (Am. Compl. at ¶ 23.)  Dr. Matan provides orthopedic consultations and

11  surgeries for some inmates at SQSP.  (Matan Decl. at ¶ 2.)  In general, Dr. Matan gives specific

12  restrictions via chronos for patients like plaintiff, and the restrictions are often based on the

13  patient's self-reporting of his or her subjective symptoms; however, Dr. Matan notes that rarely

14  is there actual evidence to support a specific restriction or chrono.  (*Id.* at ¶ 4.)  On May 8, 2008,

15  Dr. Matan issued a permanent medical chrono for plaintiff, stating "no handcuffs behind

16  plaintiff's back; instead plaintiff should be cuffed in waist restraints."  (Am. Compl. at ¶ 26;

17  Matan Decl. at ¶ 6, Ex. 1.)

18  On January 9, 2009, during a chronic care visit with Dr. Jones, plaintiff's primary care

19  physician at the time, Dr. Jones re-ordered an ice chrono, but informed plaintiff that the chrono

20  may not be approved because the CMO had changed the policy for ice chronos.  (Pl. Decl. at ¶

21  10.)  Specifically, Dr. Tootell instituted a policy that only allowed ice to be ordered in a post-

22  operative procedure involving swelling or an acute injury, but not for chronic pain.  (Am.

23  Compl. at ¶ 24.)  On January 23, 2009, Dr. Matan performed surgery on plaintiff's right

24  shoulder.  (*Id.* at ¶ 23.)  On February 23, 2009, plaintiff's "ice chrono" was not renewed because

25  of the new ice policy.  (Pl. Depo. at 93-94.)  Plaintiff asserts that the policy denied him the use of

26  ice for his chronic pain even though ice had been effective in assisting with plaintiff's daily

27  activities by alleviating severe pain and swelling.  (Am. Compl. at ¶ 25.)  Plaintiff states that

28

1   because of the policy, Dr. Jones, Dr. Matan, and Dr. Grant did not renew plaintiff's ice chronos.

2   (*Id.*)

3          On March 20, 2009, plaintiff was moved to the Adjustment Center from the East Block

4   based on an accusation that plaintiff had assaulted someone.  (*Id.* at ¶ 28.)  The Adjustment

5   Center is the most secure housing unit in the prison, and it is where death row inmates are

6   housed if they have disciplinary problems.  (Grant Decl. at ¶ 2.)  The Adjustment Center has

7   more strict security than other housing units at SQSP.  (*Id.*)  Dr. Grant is the primary care

8   physician for inmates housed in the Adjustment Center.  (*Id.* at ¶ 3.)  When inmates arrive at the

9   Adjustment Center, Dr. Grant reviews all of their chronos to ensure that they meet the guidelines

10  of the prison.  (*Id.*)  Once Dr. Grant approves or disapproves of the chronos, Dr. Tootell reviews

11  the chrono as well.  (*Id.*)

12         On March 26, 2009, Dr. Grant saw plaintiff, and concluded that plaintiff's right knee was

13  swollen and plaintiff walked with a limp.  (Am. Compl. at ¶ 28.)  Dr. Grant noted that plaintiff

14  had extensive medical issues, including hypertension, right knee pain, asthma, dyspepsia, and

15  voiding issues.  (Grant Decl. at ¶ 6, Ex. 1.)  Plaintiff informed Dr. Grant about his shoulder

16  injury and surgery, as well as the chronos issued by Dr. Matan.  (Am. Compl. at ¶ 28.)  Dr. Grant

17  responded that "we don't do that" in the Adjustment Center.  (*Id.*)  Dr. Grant then turned to

18  Sergeant Seman and asked, "How do you want to handle this?"  (Pl. Decl. at ¶ 20.)  Sergeant

19  Seman instructed Dr. Grant to write a modified cuff chrono.[2]  (*Id.*)  Dr. Grant rescinded

20  plaintiff's waist restraint chrono and wrote one for modified cuffs instead.  (Am. Compl. at ¶ 28;

21  Grant Decl. ¶ 6.)

22         On May 26, 2009, plaintiff saw Dr. Grant again.  (Grant Decl. at ¶ 7.)  Plaintiff requested

23  waist restraints and told Dr. Grant that he was having problems with his right knee.  (*Id.*)  Dr.

24  Grant denied plaintiff's requests for a waist restraint chrono and a no-kneeling chrono because

25  Dr. Grant did not feel they were medically necessary.  (*Id.*)  Dr. Grant referred plaintiff to an

26

27         [2]  "Modified cuffs" are handcuffs with a 6-inch long chain of links separating the cuffs.

28  (Am. Compl. at ¶ 66.)

1    outside orthopedist for further assessment.  (*Id.*, Ex. 2.)

2        On June 4, 2009, Dr. Matan issued another medical chrono for "waist restraints / no

3    hands behind back," "no kneeling on plaintiff's knees," and for an ankle wrap.  (Am. Compl. at ¶

4    29.)

5        On June 5, 2009, plaintiff was placed in a holding cell pending the transfer of his

6    property.  (*Id.* at ¶ 31.)  Sergeant Seman asked plaintiff who was writing his chronos.  (*Id.*)

7    Plaintiff said that the specialist wrote them, and Sergeant Seman said that for every doctor that

8    plaintiff got to write him chronos, Sergeant Seman had one who could take them away.  (*Id.*)

9    Lieutenant Arnold told Sergeant Seman that if the CMO writes an order, they have to abide by it,

10   and Sergeant Seman responded that he had "taken care of it."  (*Id.* at ¶ 32.)  Plaintiff never got

11   his chrono back.  (*Id.*)

12       Later that day, Dr. Grant rescinded all of the medical chronos authorized by Dr. Matan

13   the day before.  (*Id.* at ¶ 33.)  Plaintiff believes that Dr. Grant did so on the order of Sergeant

14   Seman and Lieuteant Arnold.  (*Id.*)  The following day, Dr. Grant issued a chrono for double

15   cuffs[3] for plaintiff in order to help plaintiff's shoulder concern.  (Grant Decl. at ¶ 8.)  Dr. Grant

16   believed that double cuffs would decrease the internal rotation on plaintiff's shoulder.  (*Id.*)  On

17   June 8, 2009, Dr. Grant approved Dr. Matan's recommendation that plaintiff receive a chrono

18   allowing plaintiff to stand for the application of leg-irons.  (*Id.* at ¶ 9.)  Normally, inmates in the

19   Adjustment Center have to kneel while staff place leg irons on them.  (*Id.*)  Dr. Grant also

20   approved the chrono for no kneeling to prevent plaintiff's knee pain from worsening.  (*Id.*)

21       On June 18, 2009, Dr. Matan prepared a chrono for "no leg irons" on plaintiff's right

22   Achilles heel, and no handcuffs behind plaintiff's back.  (*Id.* at ¶ 10; Matan Decl. at ¶ 7, Ex. 2.)

23   On July 2, 2009, Dr. Grant denied both chronos because he did not believe they were medically

24   necessary.  (Grant Decl., Ex. 5.)

25       On July 10, 2009, Dr. Grant saw plaintiff again, and did not note any concerns regarding

26

27       [3]  Neither party has defined the term "double cuffs," but, based on the papers presented,
     the court infers that "double cuffs" are less restrictive than "modified cuffs," but more restrictive
28   than "waist restraints."

1  plaintiff's shoulder.  (Grant Decl. at ¶ 11.)  Plaintiff complained of knee pain, and Dr. Grant

2  noted that plaintiff had received a corticosteroid injection for the pain.  (*Id.*, Ex. 6.)

3       On September 28, 2009, plaintiff sent a letter to Dr. Tootell, asking about the status of his

4  request for double cuff medical chrono.  (Am. Compl. at ¶ 54.)  Plaintiff also asked Dr. Tootell

5  to review his chart because plaintiff did not understand why his chronos had been rescinded.

6  (*Id.*)  Dr. Tootell never responded.  (*Id.*)

7       On October 16, 2009, Dr. Grant saw plaintiff again.  Plaintiff requested a double cuff

8  chrono instead of modified cuffs.  (Grant Decl. at ¶ 12.)  Dr. Grant noted that plaintiff's shoulder

9  and knee pain were stable, and after Dr. Grant assessed whether a double cuff could be issued for

10 plaintiff given the Adjustment Center's security needs, Dr. Grant issued a chrono for double

11 cuffs for two months with the possibility of a renewal.  (*Id.*, Ex. 7.)

12      On October 23, 2009, Dr. Grant examined plaintiff.  (*Id.*, Ex. 8.)  Even though plaintiff

13 could not put his right arm behind his back, Dr. Grant "refused plaintiff various medical items."

14 (Am. Compl. at ¶ 38.)  Dr. Grant met with plaintiff specifically to address plaintiff's shoulder

15 concerns.  (Grant Decl. at ¶ 13.)  After meeting with plaintiff, Dr. Grant decided to continue

16 plaintiff on double cuffs and again referred plaintiff to Dr. Matan for further input.  (*Id.*)

17      On November 13, 2009, plaintiff refused to come out of his cell for the second time,

18 claiming that he could not comply with the procedures for double-cuffing.  (*Id.* at ¶ 14.)  Double

19 cuffing requires an inmate to place both hands out of the handcuff port so that staff can place

20 handcuffs around the inmate.  (*Id.*)  At that time, Dr. Grant believed that plaintiff could rotate his

21 shoulder enough so that staff could cuff him.  (*Id.*, Ex. 9.)

22      On December 4, 2009, Dr. Grant met with plaintiff, and they spoke about plaintiff's

23 shoulder concern.  (*Id.* at ¶ 15.)  Dr. Grant noted that plaintiff had limited range of motion in his

24 right shoulder, and was unable to put both hands behind his back.  (*Id.*)  However, because of the

25 Adjustment Center's strict security requirements, Dr. Grant referred plaintiff's issue to Dr.

26 Tootell to assess how best to handle the situation.  (*Id.*)  Nonetheless, Dr. Grant wrote a double

27 cuff chrono for plaintiff to help alleviate handcuffing difficulties as well as relieve any pain to

28

1   plaintiff's shoulder.  (*Id.*, Ex. 10.)

2        On December 18, 2009, it was determined that plaintiff should return to the East Block in

3   order to accommodate the difficulty plaintiff was having putting both hands behind his back at

4   the same time with the security precautions of the prison.  (Decl. Ebert at ¶¶ 3-4.)  That same

5   day, plaintiff was re-housed in East Block, where Dr. Jones again became plaintiff's primary

6   care physician.  (Am. Compl. at ¶ 64.)  On January 7, 2010, plaintiff was taken to a special

7   committee – the  Interdisciplinary Treatment Team ("IDTT") – and, without evaluating plaintiff,

8   Dr. Jones stated that modified handcuffs could restrain plaintiff without further injury to

9   plaintiff's shoulder.  (*Id.*; Jones Decl. at ¶ 8.)  Dr. Jones further stated that she could not

10  authorize a medical chrono for waist restraints.  (Am. Compl. at ¶ 66.)

11       On January 14, 2010, plaintiff saw Dr. Jones and requested an x-ray of his shoulder and

12  assistance in getting his medical appliances – a cane and a walking boot – returned.  (Am.

13  Compl. at ¶ 67.)  Dr. Jones denied the requests because she did not believe that they were

14  medically necessary, but she referred plaintiff to a physical therapist for evaluation.  (*Id.*; Jones

15  Decl. at ¶ 11.)  On February 2, 2010, the physical therapist recommended that plaintiff's medical

16  boot and walking cane be returned, that medical chronos be issued, and that plaintiff receive

17  physical therapy.  (Am. Compl. at ¶ 68.)  However, the physical therapist later included an

18  addendum to his recommendation, and noted that he had observed plaintiff walking without

19  difficulty without a cane or walking book after the physical therapy session.  (Jones Decl. at ¶

20  12.)  Thus, the physical therapist withdrew his initial recommendation that plaintiff receive a

21  walking boot and cane.  (*Id.*)  Later on, Dr. Jones admitted that she made the physical therapist

22  change his diagnosis in the addendum, and told plaintiff that if plaintiff had a problem with that,

23  plaintiff could file an administrative grievance about it.  (Pl. Decl. at ¶ 108.)

24       On February 18, 2010, plaintiff appeared before the IDTT again, where Dr. Jones again

25  denied a medical chrono for the medical boot and cane.  (Am. Compl. at ¶ 69.)  Plaintiff again

26  requested waist chains, and Dr. Jones again denied the request, standing by her decision for

27  modified cuffs.  (*Id.*)

28

Order Granting In Part and Denying In Part Defendants' Motion For Summary Judgment; Denying Motion for
Preliminary Injunction; Referring Case to Settlement Proceedings
P:\PRO-SE\LHK\CR.11\Abbott183msj.wpd           6

1 Six to eight weeks later, Dr. Jones again denied plaintiff an x-ray of his shoulder.  (*Id.* at

2 ¶ 70.)  On April 22, 2010, however, Dr. Jones approved a chrono for a cane and waist chains

3 because her other attempts to address plaintiff's shoulder pain were not successful.  (Jones Decl.

4 at ¶ 13, Ex. 4.)

5 Plaintiff asserts that, because of defendants' actions, plaintiff has a permanent limp due to

6 an improperly healed Achilles, and swollen knee.  Plaintiff further asserts that he has

7 uncontrollable spasms in his lower leg and continues to suffer pain in his right shoulder.

8 **DISCUSSION**

9 I.   Motion for Summary Judgment

10 A.   Legal Standard

11 Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

12 that there is "no genuine issue as to any material fact and that the moving party is entitled to

13 judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect

14 the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute

15 as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a

16 verdict for the nonmoving party.  *Id.*

17 The party moving for summary judgment bears the initial burden of identifying those

18 portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

19 issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Where the moving

20 party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no

21 reasonable trier of fact could find other than for the moving party.  But on an issue for which the

22 opposing party will have the burden of proof at trial, the moving party need only point out "that

23 there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

24 Once the moving party meets its initial burden, the nonmoving party must go beyond the

25 pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a

26 genuine issue for trial."  Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over

27 material facts and "factual disputes that are irrelevant or unnecessary will not be counted."

28

1   *Anderson,* 477 U.S. at 248.  It is not the task of the court to scour the record in search of a

2   genuine issue of triable fact.  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The

3   nonmoving party has the burden of identifying, with reasonable particularity, the evidence that

4   precludes summary judgment.  *Id.*  If the nonmoving party fails to make this showing, "the

5   moving party is entitled to judgment as a matter of law."  *Celotex Corp.*, 477 U.S. at 323.

6        The court's function on a summary judgment motion is not to make credibility

7   determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W.*

8   *Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence

9   must be viewed in the light most favorable to the nonmoving party, and the inferences to be

10   drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id.* at

11   631.

12        B.    Plaintiff's Claims

13        Plaintiff claims that defendants' failure to treat plaintiff's medical injuries resulted in

14   further injury, such as an improperly healed Achilles, a swollen knee, a separation in his right

15   shoulder, and very severe pain.  (Am. Compl. at ¶ 75.)  Defendants argue that they are entitled to

16   judgment as a matter of law because the evidence is undisputed that none of them had the

17   requisite culpable state of mind to meet the deliberate indifference standard.

18        Deliberate indifference to a prisoner's serious medical needs violates the Eighth

19   Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth

20   Amendment only when two requirements are met: (1) the deprivation alleged is, objectively,

21   sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's

22   health or safety.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

23        A "serious" medical need exists if the failure to treat a prisoner's condition could result

24   in further significant injury or the "unnecessary and wanton infliction of pain."  *Id.*  The

25   existence of an injury that a reasonable doctor or patient would find important and worthy of

26   comment or treatment; the presence of a medical condition that significantly affects an

27   individual's daily activities; or the existence of chronic and substantial pain are examples of

28

1  indications that a prisoner has a "serious" need for medical treatment. *McGuckin v. Smith*, 974

2  F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v.*

3  *Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

4      A prison official exhibits deliberate indifference when he knows of and disregards a

5  substantial risk of serious harm to inmate health. *See Farmer*, 511 U.S. at 837. The official

6  must both know of "facts from which the inference could be drawn" that an excessive risk of

7  harm exists, and he must actually draw that inference. *Id.* "A difference of opinion between a

8  prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

9  claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a claim of medical

10  malpractice or negligence is insufficient to establish a violation of the Eighth Amendment.

11  *McGuckin*, 974 F.2d at 1059. In particular, a plaintiff's opinion that medical treatment was

12  unduly delayed does not, without more, state a claim of deliberate indifference. *Shapley v.*

13  *Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Where doctors have

14  chosen one course of action and a prisoner-plaintiff contends that they should have chosen

15  another course of action, the plaintiff "must show that the course of treatment the doctors chose

16  was medically unacceptable under the circumstances, . . . and the plaintiff must show that they

17  chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v.*

18  *McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

19              1.   <u>Dr. Grant</u>

20      Plaintiff alleges that Dr. Grant was deliberately indifferent to his serious medical needs

21  because Dr. Grant repeatedly denied plaintiff's request for chronos for waist restraints and no

22  kneeling, both of which were chronos issued by Dr. Matan. Dr. Grant responds that his

23  treatment of plaintiff was proper, and that the chronos were not medically necessary at the time

24  Dr. Grant denied plaintiff's requests.

25      As an initial matter, portions of plaintiff's declaration are inadmissible because they are

26  not based on personal knowledge. *See Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th

27  Cir. 2013). Thus, to the extent plaintiff's declaration is not based on personal knowledge, those

28

Order Granting In Part and Denying In Part Defendants' Motion For Summary Judgment; Denying Motion for
Preliminary Injunction; Referring Case to Settlement Proceedings
P:\PRO-SE\LHK\CR.11\Abbott183msj.wpd     9

1    portions will not be considered by the court.  Defendants also urge the court to strike portions of

2    plaintiff's declaration as sham.  A party may not "create an issue of fact by an affidavit

3    contradicting his prior deposition testimony."  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir.

4    2012).

5            Defendants point out that plaintiff raises new facts concerning Dr. Grant, Sergeant

6    Seman, and Dr. Jones.  These facts were not raised in plaintiff's amended complaint nor

7    mentioned during plaintiff's deposition.  In plaintiff's amended complaint, plaintiff stated that,

8    on March 26, 2009, he told Dr. Grant about the chrono for waist restraints.  Dr. Grant responded,

9    "we don't do that here in the Adjustment Center," rescinded the waist chrono, and wrote plaintiff

10   a chrono for modified cuffs.  (Am. Compl. at ¶ 28.)  Similarly, plaintiff's testimony in his

11   deposition reiterated what plaintiff wrote in his amended complaint.  (Zelidon-Depeda Decl., Ex.

12   1, Ex. 13 at 40.)  In plaintiff's declaration in support of his opposition to defendants' motion for

13   summary judgment, plaintiff newly asserted that on March 26, 2009, when Sergeant Seman

14   brought plaintiff to see Dr. Grant, Dr. Grant told plaintiff that the Adjustment Center does not

15   "do waist restraints," and turned to ask Sergeant Seman, "how do you want to handle this?"  (Pl.

16   Decl. at ¶ 20.)  In response, asserts plaintiff, Sergeant Seman directed Dr. Grant to write a

17   modified cuff chrono instead, and Dr. Grant complied.  (*Id.*)  In plaintiff's amended complaint

18   and plaintiff's deposition, plaintiff did not mention that Sergeant Seman and Dr. Grant had any

19   discussion at all, much less a pointed discussion about what cuffs to use on plaintiff on March

20   26, 2009.

21           With respect to sham affidavits, the rule applies in situations in which a party attempts to

22   "create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Van Asdale*

23   *v. Int'l Game Technology*, 577 F.3d 989, 998 (9th Cir. 2009).  While the rule is to be applied

24   with caution in any event, *id.*, the omission of a fact is not the same as the contradiction of a fact.

25   Thus, the "sham affidavits" rule is inapplicable in this context.  Plaintiff's declaration is based on

26   his personal knowledge and is not contradicted by any allegations he made in his complaint or

27   deposition.

28

1    Plaintiff takes issue with the fact that Dr. Grant "rescinded" the chronos written by Dr.

2  Matan, and did not approve plaintiff's requests for those chronos, as part of the treatment plan

3  even though plaintiff believed that those chronos were essential.  The evidence shows that, over

4  the course of nine months, Dr. Grant personally met with plaintiff six times.  (Grant Decl. at ¶¶

5  6, 7, 11, 12, 13, 15.)  Over the course of those months, Dr. Grant would examine plaintiff, treat

6  plaintiff's ailments, refer plaintiff to the orthopedist, and reject plaintiff's requests for certain

7  chronos even though Dr. Matan had issued the chronos.  Dr. Grant asserts that he made these

8  decisions because Dr. Grant believed that the chronos were not medically necessary.  However,

9  plaintiff's alleges that Dr. Grant's decisions were not based on proper medical determinations, as

10  exemplified by Dr. Grant's compliance with Sergeant Seman's direction to use modified cuffs on

11  plaintiff rather than waist restraints.  The court concludes that there is a genuine issue of material

12  fact regarding whether Dr. Grant was deliberately indifferent to plaintiff's medical needs.  *See*

13  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (stating that if it were proved at trial that

14  doctors denied a prisoner on dialysis a kidney transplant because of personal animosity, and that

15  the delay in performing the transplant was "medically unacceptable," that would demonstrate

16  deliberate indifference).

17    Alternatively, defendants argue that Dr. Grant is entitled to qualified immunity.  The

18  defense of qualified immunity protects "government officials . . . from liability for civil damages

19  insofar as their conduct does not violate clearly established statutory or constitutional rights of

20  which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

21  (1982). A court considering a claim of qualified immunity must determine: (1) whether the

22  plaintiff has alleged the deprivation of an actual constitutional right, and (2) whether such right

23  was clearly established such that it would be clear to a reasonable officer that his conduct was

24  unlawful in the situation he confronted.  *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).

25    Here, plaintiff claims that Dr. Grant refused to honor the chronos, knowing that they were

26  helpful to plaintiff and implies that Dr. Grant's decisions were influenced not by his medical

27  knowledge, but by the opinions of correctional staff.  Viewing the facts in the light most

28

1   favorable to plaintiff, the court concludes that Dr. Grant is not entitled to qualified immunity.

2   *See Jackson*, 90 F.3d at 332 (rejecting defendants' claim for qualified immunity based on

3   plaintiff's allegation that "the doctors chose to deny him the opportunity for a kidney transplant,

4   not because of an honest medical judgment, but on account of personal animosity").

5          Accordingly, defendants' motion for summary judgment as to Dr. Grant is DENIED.

6                          2.    Dr. Jones

7          Plaintiff alleges that Dr. Jones was deliberately indifferent to his serious medical needs

8   after plaintiff returned to her care from the Adjustment Center.  Dr. Jones responds that her

9   treatment of plaintiff was proper.

10          Based on the evidence, plaintiff returned to the care of Dr. Jones in December 2009,

11   when plaintiff was re-housed in the East Block.  (Opp. at 14.)  Dr. Jones concedes that in January

12   2010, she met with the IDTT and concluded that a chrono for modified handcuffs would be

13   sufficient to treat plaintiff even though Dr. Jones had not personally examined plaintiff in the

14   previous months.  (Jones Decl. at ¶ 8.)  Dr. Jones stated that she was familiar with plaintiff's

15   medical history and, based on her experience and medical training, believed that modified cuffs

16   were appropriate for him at the time.  (*Id.*)  At most, Dr. Jones' conclusion about what was

17   appropriate for plaintiff was negligent, which is insufficient to establish a violation of the Eighth

18   Amendment.  *See Toguchi*, 391 F.3d at 1060-61.  Again, plaintiff does not and cannot show that

19   the course of treatment Dr. Jones chose was medically unacceptable under the circumstances,

20   and that she chose this course in conscious disregard of an excessive risk to plaintiff's health.

21   *See id.* at 1058.

22          Plaintiff also complains that, on January 14, 2010, Dr. Jones denied plaintiff's request for

23   an x-ray of his shoulder, as well as the return of plaintiff's walking boot and cane to assist

24   plaintiff in walking.  Dr. Jones' medical notes indicate that Dr. Jones addressed plaintiff's other

25   medical issues, and renewed plaintiff's personal athletic shoe chrono, but declined to renew his

26   chrono for a walking cane because Dr. Jones had observed that plaintiff's gait was normal and

27   stable.  (Jones Decl. at ¶ 10, Ex. 2.)  Dr. Jones also referred plaintiff to physical therapy.  (*Id.*)

28

1  Again, plaintiff's dissatisfaction with Dr. Jones' decision is a matter of a difference of medical

2  opinion. *See Toguchi*, 391 F.3d at 1058, 1059-60. Moreover, "[a] medical decision not to order

3  an X-ray, or like measures, does not represent cruel and unusual punishment." *Estelle*, 429 U.S.

4  at 107.

5       Finally, in plaintiff's opposition, plaintiff argues for the first time that, in February 2010,

6  Dr. Jones admitted that she made the physical therapist to change his diagnosis that plaintiff

7  needed a walking boot or cane. (Pl. Decl. at ¶¶ 106-110.) Defendants argue that the court

8  should strike this new statement as a sham. However, the statement is an omission rather than a

9  contradiction of a fact. *See Van Asdale* , 577 F.3d at 998. Thus, the "sham affidavits" rule is

10  inapplicable in this context. Nonetheless, even assuming the truthfulness of plaintiff's assertion

11  that Dr. Jones persuaded the physical therapist to change his opinion regarding whether a

12  walking cane or boot was medically necessary for plaintiff, there is an absence of evidence that

13  the recommendation for or against a walking cane or boot was not based on medical opinion.

14  *See Toguchi*, 391 F.3d at 1058, 1059-60. Specifically, plaintiff has not shown that the course of

15  treatment Dr. Jones chose was medically unacceptable under the circumstances and that she

16  chose this course in conscious disregard of an excessive risk to plaintiff's health. *See id.* at 1058.

17       Defendants have met their burden of demonstrating the absence of a genuine issue of

18  material fact. Thus, defendants are entitled to judgment as a matter of law as to Dr. Jones.[4]

19             3.     Lieutenant Arnold and Sergeant Seman

20       Plaintiff claims that Lieutenant Arnold and Sergeant Seman directed Dr. Grant to rescind

21  the medical chronos issued by Dr. Matan on June 4, 2009. (Pl. Depo. at 135.) Specifically, on

22  that day, Sergeant Seman told plaintiff that for every doctor plaintiff persuaded to write a chrono

23  for him, Sergeant Seman could find a doctor to take it away. (*Id.* at 107.)

24       With respect to Sergeant Seman, there is an absence of evidence that Dr. Grant rescinded

25  the chronos in June 2009 because Sergeant Seman directed him to do so. (Pl. Depo. at 107.)

26

27

28      [4] Because the court is granting summary judgment on the merits as to Dr. Jones, it is unnecessary to also discuss qualified immunity.

1   Plaintiff admitted that Sergeant Seman had walked into another room with plaintiff's chrono, and

2   plaintiff "presumes" that Dr. Grant was in that other room.  (*Id.*)  Moreover, even assuming that

3   plaintiff had a serious medical need, there is no evidence that Sergeant Seman was aware that

4   plaintiff faced a substantial risk of serious harm without the chronos, and that Sergeant Seman

5   disregarded that risk by failing to take reasonable steps to abate it.  *See Farmer*, 511 U.S. at 837.

6   In addition, in order for deliberate indifference to be established, there must be a purposeful act

7   or failure to act on the part of the defendant and resulting harm.  *See McGuckin*, 974 F.2d at

8   1060.

9        Here, the June 4, 2009 chronos written by Dr. Matan were for waist restraints, no

10  kneeling, and an ankle wrap on plaintiff's right Achilles heel.  (Am. Compl. at ¶ 29.)  The

11  evidence is undisputed that the following day, Dr. Grant wrote a chrono for plaintiff to receive

12  double cuffs.  (Grant Decl. at ¶ 8.)  Three days thereafter, Dr. Grant issued a chrono allowing

13  plaintiff to stand for the application of leg irons.  (*Id.* at ¶ 9.)  Then, on July 2, 2009, Dr. Grant

14  denied another chrono issued by Dr. Matan for no leg irons and no handcuffs behind plaintiff's

15  back.  (*Id.* at ¶ 10.)  Within this one month of time between the day plaintiff alleges Sergeant

16  Seman destroyed his June 4, 2009 chronos, and the day Dr. Grant denied similar chronos, there

17  is no evidence that there was any resulting harm that was caused by Sergeant Seman's act of

18  destroying the June 4, 2009 chronos.  *See McGuckin*, 974 F.2d at 1060.

19       Plaintiff's only specific allegation against Lieutenant Arnold is that Lieutenant Arnold

20  reminded Sergeant Seman that if the Chief Medical Officer wrote a chrono for an inmate,

21  correctional staff have to honor it.  Plaintiff alleges that Lieutenant Arnold should have made

22  Sergeant Seman return the June 4, 2009 chronos written by Dr. Matan.  This allegation is

23  insufficient to sustain a claim of deliberate indifference to plaintiff's serious medical needs.

24  Even assuming plaintiff had a serious medical need, there is no indication that Lieutenant Arnold

25  would know that a failure to return the chronos would result in a substantial risk of serious harm

26  or that Lieutenant Arnold disregarded that risk by failing to take reasonable steps to abate it.  *See*

27  *Farmer*, 511 U.S. at 837.

28

1    For all the above reasons, defendants' motion for summary judgment as to Lieutenant

2    Arnold and Sergeant Seman is GRANTED.[5]

3              4.      Chief Medical Officer Dr. Tootell

4              Plaintiff had an ice chrono from 2006 through early 2009 to treat his chronic pain.

5    Plaintiff claims that in early 2009, Dr. Tootell instituted a deficient policy to allow chronos for

6    ice to treat only acute injuries.  The chronos would last for a maximum of two weeks, absent

7    unusual circumstances.  Because of this policy, plaintiff alleges that on February 22, 2009,

8    plaintiff's ice chrono was not renewed to treat his chronic pain.  Plaintiff further alleges that a

9    representative from the California Appellate Project wrote two letters to Dr. Tootell requesting

10   that Dr. Tootell review plaintiff's medical record and reconsider permitting waist restraints and

11   an ice chrono.  (Pl. Decl., Ex. 8.)  Plaintiff also wrote a letter to Dr. Tootell requesting the same.

12   (*Id.*)  Plaintiff alleges that Dr. Tootell never responded to any of the letters.  (Am. Compl. at

13   ¶ 54.)

14             Dr. Tootell responds that in 2009, she was told by medical staff that providing ice to

15   inmates with ice chronos was impacting their ability to deliver medicine to inmates, and because

16   of the way the ice was packaged, it was logistically difficult to deliver the ice in a timely manner.

17   (Tootell Decl. at ¶ 3.)  Based on these concerns, Dr. Tootell met with other medical providers at

18   SQSP to discuss ice chronos.  (*Id.* at ¶ 4.)  Dr. Tootell states that, in her experience, ice is usually

19   helpful for inmates with acute injuries for two weeks, and after those two weeks, "there is no

20   medical evidence that ice is helpful for medical conditions."  (*Id.*)  As such, Dr. Tootell and the

21   medical staff at SQSP determined that, absent unusual situations where medical concerns

22   warranted the use of ice, ice chronos would be limited to two weeks.  (*Id.* at ¶¶ 4, 7.)

23             "Supervisory liability exists . . . without overt personal participation in the offensive act

24   if supervisory officials implement a policy so deficient that the policy itself is a repudiation of

25   constitutional rights and is the moving force of the constitutional violation."  *Redman v. County*

26

27        _____

          [5]   Because the court is granting summary judgment on the merits, it is unnecessary to
28   also discuss qualified immunity.

1    *of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (internal quotation marks omitted).  Here, the

2    evidence is undisputed that, Dr. Tootell made a decision, based on her medical training and

3    experience, to limit ice chronos to two weeks absent unusual circumstances because she was

4    unaware of any medical evidence that ice was helpful for medical concerns beyond two weeks.

5    (Tootell Decl. at ¶¶ 4, 6.)  If a medical provider thinks that an ice chrono is medically indicated

6    for an inmate beyond the two weeks, and coordinates the request with the nursing staff, Dr.

7    Tootell will approve the request.[6]  (*Id.* at ¶ 5.)  Drawing all factual inferences in favor of

8    plaintiff, a reasonable jury could not find that Dr. Tootell's policy was deliberately indifferent to

9    plaintiff's medical needs by restricting the use of ice chronos.  *See id.* at 1447.

10       With respect to plaintiff's allegations that Dr. Tootell ignored plaintiff's letters

11   requesting that she review and reconsider plaintiff's requests for chronos, plaintiff alleges that

12   Dr. Tootell received and ignored the letters sent to her by plaintiff and the California Appellate

13   Project.  Thus, argues plaintiff, Dr. Tootell knew that plaintiff was concerned about the

14   discontinuation of his medical chronos, and did nothing to abate the risk.  There is a genuine

15   issue of material fact whether Dr. Tootell was deliberately indifferent to plaintiff's serious

16   medical needs.  *See Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006) (concluding that genuine

17   issue of material fact existed at the summary judgment stage, and inmate was entitled to an

18   inference that supervisory doctor received the letters inmate declared that inmate sent to him).

19   Alternatively, defendants argue that Dr. Tootell is entitled to qualified immunity.  Viewing the

20   facts in the light most favorable to plaintiff, the court concludes that Dr. Tootell is not entitled to

21   qualified immunity.  *See id.* (citing *Estelle*, 429 U.S. at 104).  The law was clearly established

22   that prison administrators are liable for deliberate indifference when they knowingly fail to

23   respond to an inmate's requests for help.  *See Jett*, 439 F.3d at 1098.

24

25       [6]  Plaintiff disputes the veracity of this statement.  (Pl. Decl. at ¶ 13.)  However, on
     January 8, 2009, when Dr. Jones rewrote an ice chrono for plaintiff, she indicated that it may not
26   be approved because of the new ice chrono policy, however, she believed that an ice chrono was
     "reasonable."  (Pl. Opp., Ex. 3.)  Notably, there is no evidence that Dr. Jones attempted to
27   coordinate the request for renewal with the nursing staff, nor is there evidence that Dr. Jones
     believed the ice chrono was "medically indicated" or medically necessary.
28

1   Defendants' motion for summary judgment against Dr. Tootell is GRANTED in part and
2   DENIED in part.

3   II.   Motion for Preliminary Injunction

4       Plaintiff's motion for preliminary injunction requests that he receive two quarts of ice,
5   twice daily to alleviate his pain and swelling for his left Achilles tendon, which plaintiff ruptured
6   on August 4, 2012.  Defendants argue, *inter alia*, that plaintiff is seeking to use the request for
7   preliminary injunctive relief as a means to litigate a claim unrelated to those set forth in his
8   amended complaint.  They argue that he cannot seek relief related to events occurring after the
9   filing of the instant lawsuit which are not related to the incident at issue.  This court agrees.  The
10  purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial
11  on the merits can be held.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The
12  preliminary injunction is meant to protect the plaintiff from irreparable injury and preserve the
13  court's power to render a meaningful decision on the merits.  *Los Angeles Memorial Coliseum*
14  *Commission v National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

15      Plaintiff's motion instead asks the court to issue a preliminary injunction to require the
16  prison to change the status quo, as plaintiff does not presently have an ice chrono.  Moreover,
17  "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the
18  merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the
19  balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*
20  *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).   Here, the court has granted
21  summary judgment to Dr. Tootell regarding the ice chrono policy.  Thus, plaintiff can not
22  establish that he is likely to succeed on the merits regarding the ice policy claim.

23      Moreover, plaintiff's motion claims that plaintiff is not receiving ice even after plaintiff
24  injured his left Achilles tendon on August 4, 2012.  The allegations in plaintiff's motion have all
25  arisen after the filing of plaintiff's underlying first amended complaint.  Thus, plaintiff could not
26  have exhausted these claims prior to bringing this action.  The plain language of 42 U.S.C. §
27  1997e(a) provides that no § 1983 action "shall be brought . . . until such administrative remedies
28

Order Granting In Part and Denying In Part Defendants' Motion For Summary Judgment; Denying Motion for
Preliminary Injunction; Referring Case to Settlement Proceedings
P:\PRO-SE\LHK\CR.11\Abbott183msj.wpd          17

1  as are available are exhausted." 42 U.S.C. § 1997e(a).  The Ninth Circuit's decision in

2  *McKinney v. Carey*, 311 F.3d 1198 (9th Cir. 2002) holds that prisoners who are incarcerated at

3  the time they file a civil action which challenges the conditions of their confinement are required

4  to exhaust "all administrative remedies as are available" as a mandatory precondition to suit.  *See*

5  *McKinney*, 311 F.3d at 1198.

6      Accordingly, plaintiff's motion for preliminary injunction is DENIED.

7  III.   <u>Referral to Pro Se Prisoner Settlement Program</u>

8      Prior to setting this matter for trial and appointing pro bono counsel to represent plaintiff

9  for that purpose, the court finds good cause to refer this matter to Judge Vadas pursuant to the

10 Pro Se Prisoner Settlement Program for settlement proceedings on the claim set forth above.

11 The proceedings will consist of one or more conferences as determined by Judge Vadas.  The

12 conferences shall be conducted with Dr. Tootell and Dr. Grant, as well as defendants Guithrie,

13 Thompson, Zeiler, Van Mastrigt, Cullen, Orozco, Dacanay, McGehee, Asuncion, and Wong, or

14 their representatives, attending by videoconferencing if they so choose.

15                      **CONCLUSION**

16      1.     Defendants' motion for summary judgment is GRANTED as Dr. Jones,

17 Lieutenant Arnold, and Sergeant Seman.  Defendants' motion for summary judgment is

18 GRANTED in part and DENIED in part as to Dr. Tootell.  Defendants' motion for summary

19 judgment is DENIED as to Dr. Grant.

20      2.     Plaintiff's motion for preliminary injunction is DENIED.

21      3.     The instant case is REFERRED to Judge Vadas pursuant to the Pro Se Prisoner

22 Settlement Program for settlement proceedings on the remaining claim in this action, as

23 described above.  The proceedings shall take place within **ninety (90) days** of the filing date of

24 this order.  Judge Vadas shall coordinate a time and date for a settlement conference with all

25 interested parties or their representatives and, within **ten (10) days** after the conclusion of the

26 settlement proceedings, file with the court a report regarding the prisoner settlement proceedings.

27      5.     The clerk of the court shall mail a copy of this order to Judge Vadas in Eureka,

28

California.

6.     The instant case is STAYED pending the settlement conference proceedings.  The clerk shall ADMINISTRATIVELY CLOSE this action until further order of the court.

IT IS SO ORDERED.

DATED: _____2/24/14_____        _____
                                    LUCY H. KOH
                                    United States District Judge

Order Granting In Part and Denying In Part Defendants' Motion For Summary Judgment; Denying Motion for
Preliminary Injunction; Referring Case to Settlement Proceedings
P:\PRO-SE\LHK\CR.11\Abbott183msj.wpd        19